## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CORNELIUS  HILL | : |
| and | : |
| TRUDIE HASTINGS HILL H/W | : |
| Plaintiffs | : |
| SCHIFFAHRTSGESELLSCHAFT MS | :     NO. 02-CV-2713 |
| PRIWALL mbH & Co. KG | : |
| and | : |
| REEDEREI F. LAEISZ G.m.b.h., ROSTOCK | : |
| Defendants | :     JURY TRIAL DEMANDED |

## <u>ORDER</u>

AND NOW, this          day of            , upon consideration of the Motion for

Summary Judgment filed by defendants Schiffahrtsgesellschaft MS Priwall mbH & Co. KG and

Reederei F. Laeisz G.m.b.h., Rostock and any response thereto, it is hereby ORDERED that the

Motion is GRANTED and Summary Judgment is hereby ENTERED in favor of defendants

Schiffahrtsgesellschaft MS Priwall mbH & Co. KG and Reederei F. Laeisz G.m.b.h., Rostock.

BY THE COURT:

_____
                                              J.

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| CORNELIUS HILL | : | |
| and | : | |
| TRUDIE HASTINGS HILL H/W | : | |
| Plaintiffs | : | |
| SCHIFFAHRTSGESELLSCHAFT MS | : | NO. 02-CV-2713 |
| PRIWALL mbH & Co. KG | : | |
| and | : | |
| REEDEREI F. LAEISZ G.m.b.h., ROSTOCK | : | |
| Defendants | : | JURY TRIAL DEMANDED |

---

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56(b), defendants Schiffahrtsgesellschaft MS Priwall

mbH & Co. KG ("Priwall") and Reederei F. Laeisz G.m.b.h., Rostock ("Laeisz"), by their

attorneys, Rawle & Henderson, LLP, hereby move this Court to enter summary judgment in their

favor and, in support thereof, aver as follows:

1.      Plaintiff Cornelius Hill, a longshoreman, filed this lawsuit against

defendants Priwall and Laeisz to recover damages for personal injuries that he allegedly

sustained while working aboard the M/V SEA PANTHER.  Plaintiff seeks to recover damages

under the Longshore and Harbor Workers' Compensation Act, ("LHWCA"), 33 U.S.C. §905(b).

See Amended Complaint attached hereto as Exhibit "A."

2.      Defendants are the owner and operator of the merchant vessel M/V SEA

PANTHER.  During the time period relevant to this action, the defendants chartered the M/V

SEA PANTHER to Crowley American Transport ("Crowley").  The M/V SEA PANTHER, a

container vessel, was involved in regular liner service carrying containers between ports

throughout the east coast of South America and the east coast of the United States.  See

Amended Complaint, Exhibit "A," at ¶7; <u>see also</u> Defendants' Answer to the Amended

Complaint, attached hereto as Exhibit "B."

   3.  On August 25, 2000, the M/V SEA PANTHER, was docked at a pier and

terminal operated by Delaware River Stevedores ("DRS") in the Port of Philadelphia. <u>See</u>

Amended Complaint, Exhibit "A.".  Containers being carried on the vessel were to be discharged

by employees of DRS, an independent stevedoring contractor.  <u>See</u> Amended Complaint, Exhibit

"A," at ¶10.

   4.  Plaintiff Cornelius Hill and his co-employee, Dwight Jones, were

employed by DRS as longshoremen.  <u>See</u> Dep. of C. Hill, attached hereto as Exhibit "C," pp. 31-

33.

   5.  At approximately 10:30 p.m. on August 25, 2000, the vessel was turned

over to DRS and its employees (the longshoremen) to commence discharge operations.  <u>See</u>

Dep. of Captain Schuessler, attached hereto as Exhibit "D," p. 160.  The unlashing of the

containers stowed on the vessel was part of the discharge operation and had to be carried out

before the containers could be lifted off of the vessel by a crane.  Under the International

Longshoreman's Association's collective bargaining agreement in the Port of Philadelphia, only

longshoremen are allowed to unlash and discharge containers at the DRS facility.  <u>See</u>

Deposition of Mr. Vagn Ejsing, attached hereto as Exhibit "E," p. 26.

   6.  At the start of the discharge operation, plaintiff Cornelius Hill and Dwight

Jones, another longshoreman, were assigned to unlash containers from the aft part of the vessel.

<u>See</u> Dep. of C. Hill, Exhibit "C," at pp. 46-48.

   7.  On the day of the accident, before discharge operations began, the

longshoremen's supervisor was given an opportunity to board the vessel and make an inspection.

After that inspection took place, Hill and Jones boarded the vessel and unlashed one "bay" or

section of containers without any problems.  See Dep. of C. Hill, Exhibit "C," at pp. 46-48; see also Deposition transcript of co-worker D. Jones, attached hereto as Exhibit "F," at p. 20.

8.    The accident in question occurred while Hill and Jones were unlashing containers at a second bay.  See Dep. of D. Jones, Exhibit "F," at pp. 21 and 22.  Before they started work near the second bay, Hill and Jones inspected the area and they did not see any defects or problems.  Id. at p. 25; see also Dep. of C. Hill, Exhibit "C," at pp. 59-66.

9.    Plaintiff Cornelius Hill was allegedly injured when he was struck by a falling lashing bar, which was part of the lashing gear used to lash or secure the containers to the deck of the vessel, so they did not shift or move during the voyage.

10.    The lashing gear at issue consisted of rods and turnbuckles.  A lashing rod is a galvanized metal pole that has a fitting at the top, which hooks on to a corner of the container.  See photographs attached hereto as Exhibit "G."  The lower part of the lashing pole is then moved into place and secured with a turnbuckle.  Id.  A diagram that demonstrates the attachment of a turnbuckle is attached hereto as Exhibit "H."  Furthermore, during his deposition, Mr. Jones described the procedure for attaching and securing a lashing bar and turnbuckle.  See Dep. of D. Jones, Exhibit "F", at p. 17.

11.    To unlash a container for discharge, the longshoremen would turn or loosen the turnbuckle, loosen the connection, disengage the bar from the fitting at the top corner of the container and lower the bar to the vessel's deck.  See Dep. of C. Hill, Exhibit "C", at pp. 53-57.  However, according to plaintiff Cornelius Hill and his co-worker, Dwight Jones, if the turnbuckle is difficult to turn (i.e. "frozen"), they would hit the turnbuckle with a wrench to "loosen it."  Id. at pp. 58-59; see also Dep. of D. Jones, Exhibit "F", at pp. 22.

12.    Shortly before the accident, Dwight Jones was unlashing a container and he tried to loosen one of the turnbuckles.  When he looked at the turnbuckle and lashing rod, he

did not see any defects or problems.  However, the turnbuckle was tight and he had trouble

moving it with a wrench.  Therefore, Jones proceeded to strike the turnbuckle with a wrench to

"loosen" it.  When Jones struck the turnbuckle with the wrench, the top of the lashing rod came

out of the fitting at the top corner of the container and the rod fell and struck Cornelius Hill.  See

Dep. of D. Jones, Exhibit "F," at p. 22.

13.    Prior to the accident, Mr. Jones did not report any problems with the

turnbuckle to his supervisor and he did not tell the crew that there were any problems with the

turnbuckle.  In addition, Jones did not ask Hill for assistance and he did not warn Hill that he was

going to strike the turnbuckle with the wrench.  Id. at pp. 22-32.

14.    Plaintiff Cornelius Hill does not know how or why the accident occurred.

He does not know of any problems involving the vessel's equipment that contributed to the

accident in any way.  All he knows is that he was hit by a lashing rod and Dwight Jones was the

only person in the area. See Dep. of C. Hill, Exhibit "C," at pp. 64-66.

15.    According to Mr. Jones, he did not see any problems with the equipment

before or after the accident since nothing broke when he hit the turnbuckle with the wrench.

When he hit the turnbuckle, the lashing rod "flew" out and it hit Mr. Hill.  See Dep. of D. Jones,

Exhibit "F," at pp. 27-31.

16.    Mr. Jones looked at the lashing gear right before he hit it with the wrench

and he could not tell that the lashing pole was going to fall.  Id. at pp. 31-32, 35-38.

17.    After the accident, both the Captain and the stevedore supervisor inspected

the area and neither one of them found any defective or broken equipment. See Dep. of V.

Ejsing, Exhibit "E" at pp. 26, 27 and 28,  See also Dep. of Captain Schuessler, Exhibit "D" at pp.

158 and 159.

18.    There is no evidence that any defect in the lashing bar, turnbuckle or any piece of ship's equipment caused the accident.

19.    Plaintiff's co-worker hit the lashing bar with a wrench and knocked it loose, causing the accident.  See Dep. of D. Jones, Exhibit "F," at pp. 27-31.

20.    To establish a cause of action, plaintiff bears the burden of establishing that the defendants breached a duty of care under § 905(b) of the LHWCA, 33 U.S.C. § 905(b).

21.    Under established law, a vessel owner owes the following limited duties of care to a longshoreman who boards the vessel to perform cargo operations: (1) the "turnover duty," which includes a corollary "duty to warn;" (2) the "active participation duty;" and (3) the "duty to intervene."

22.    The "active operations duty" is only applicable if the vessel retains active control over the instrumentality or area in question or the activities of the stevedore.  In this case, the evidence clearly shows that the vessel was turned over the stevedore for discharge operations and the vessel did not maintain active control over the instrumentality or the area in question.  Therefore, the "active operations duty" is not applicable to this case.

23.    Also, a vessel owner only has a "duty to intervene" in the cargo operations of an independent stevedore if it has actual knowledge of a dangerous condition and it has actual knowledge that it cannot rely on the stevedore to avoid or eliminate the alleged hazard.  In this case, there is no evidence that the vessel had actual knowledge of the alleged hazard or actual knowledge that it could not rely on the stevedore to remedy, avoid or report any perceived hazards.  Therefore, the duty to intervene is not applicable to this case.

24.    The duty at issue in this case is the "turnover duty," which includes a corollary "duty to warn."  These duties define a shipowner's standard of care before cargo operations have begun.

25.    The Captain of the M/V SEA PANTHER testified during his deposition

about the vessel's condition before discharge operations began:

Q:    When the vessel was turned over after the inspection to the stevedore
company, was the vessel in a condition where experienced longshoremen
could carry out their operations with reasonable safety?

A:    Yes.

Q:    Prior to turnover, prior to the stevedores coming on board, was the vessel
aware of any frozen turnbuckles?

A:    No.

Q:    So prior to the discharging happening, so I'm saying at sea now, prior to
the turnover, did any crew member specifically identify any hazards on the
vessel?  Were there any hazards that the vessel knew about prior to the
longshoremen coming on board?

A:    Nothing.  In case there would be hazards, no stevedores comes aboard,
absolutely.

See Dep. of Captain Schuesler, Exhibit "D" at pp. 161.

26.    The Captain of the M/V SEA PANTHER testified that the vessel carried

out inspections prior to the vessel being turned over to the stevedore and no defects or problems

were discovered:

Q:    And additional inspections of the general condition of the cargo, the
general condition of the lashing is conducted daily?

A:    Daily.

Q:    And in your estimation, prior to this accident, the lashing gear in the area
where the accident occurred was inspected at least 30 time or
approximately 30 times?

A:    I think so. Yes.

Q:    During all of those inspections, no one ever noted any defect or problem?

A:    That's correct.

Id. at 171.

27.    Also, the Captain inspected the area following the accident and he did not find any defects or problems with the vessel or its equipment.  Id.

28.    To establish a cause of action under the turnover duty, plaintiff has the burden of establishing that: (1) the accident was caused by a defect in the vessel or its equipment; (2) the defendant vessel owner knew about the hazard or should have discovered it before the vessel was turned over to the stevedore; (3) the hazard was one likely to be encountered by the stevedore in the course of its operations; **and** (4) the hazard was one which plaintiff's employer did not know about and which would not be obvious to or anticipated by a reasonably competent stevedore.

29.    In this case, there is no evidence of a defect in the vessel or its equipment. The lashing gear was observed before and after the accident and there is no evidence of any defects whatsoever.  Therefore, plaintiff cannot establish a cause of action under the "turnover duty."

30.    Mr. Jones inspected the lashing gear right before the accident and he said that "[b]y looking at the condition of the lashing gear . . . , you couldn't tell by looking at it that it was going to fall."  See Dep. of D. Jones Exhibit "F," at pp. 31-32.

31.    Therefore, if there was any problem with the condition of the lashing gear, it was a hidden or latent condition.  As a matter of law, a vessel owner cannot be held liable for a latent condition related to the stowage of cargo.

32.    If there were any problems with the attachment of the lashing gear to the containers (which is speculation), that is not a defect in the ship's equipment, but a deficiency in the cargo stow.  Under established law, a vessel owner does not have a duty to remedy cargo stowage defects since the unloading stevedore is hired for its expertise identifying and remedying such hazards.

33.     Furthermore, a vessel owner does not have a "duty to warn" a stevedore about the condition of the cargo stow, unless it has actual knowledge of a hazard and actual knowledge that it cannot rely on the stevedore to avoid the hazard.  In this case, there is no evidence that the vessel had actual knowledge of any hazard involving the lashing gear or the containers and the vessel did not have actual knowledge that it could not rely on the stevedore to identify and avoid any such hazards.

34.     If plaintiffs argue that the alleged hazard "should have been" observable or discoverable by the vessel's crew, then it follows that the condition was equally observable and discoverable by the stevedore-employer, since the stevedore was hired to perform the unlashing process.

35.     Under established law, a vessel owner cannot be held liable for an accident caused by an open and obvious hazard.  Therefore, if plaintiffs argue that the vessel "should have" known of the alleged hazard, plaintiffs' claims must be dismissed as a matter of law because, under that scenario, the condition qualifies as open and obvious because it should have been discovered by a reasonably competent stevedore.

36.     The stevedore-employer was hired to unlash and discharge the cargo containers.  Therefore, the stevedore was hired to identify and remedy hazards related to the lashing gear and the vessel owner did not have a duty to protect the plaintiff-longshoreman from risks inherent to that work.

37.     The turnover duty only requires that the vessel be turned over in such a condition that an "expert and experienced stevedore" may carry on its operations with "reasonable safety."  Under the law, a vessel owner is entitled to rely on the expertise of the stevedore and certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them.

38.    As a matter of law, a vessel owner does not have a duty to foresee the negligence of a longshoremen or the stevedore – employer.

39.    In this case, there is no evidence to support a cause of action under §905(b) of the Longshore & Harbor Workers' Compensation Act.

WHEREFORE, defendants Priwall and Laeisz respectfully request that this Court grant its Motion and enter summary judgment in their favor.

Respectfully submitted,

RAWLE & HENDERSON LLP

By:_____
        Carl D. Buchholz, III, Esquire
        Michael P. Zipfel, Esquire
        Charles W. McCammon, Esquire
        Attorneys for Defendants
        The Widener Building
        One South Penn Square
        Philadelphia, PA  19107
        Phone: (215) 575-4200.

DATED:  July 7, 2003

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| _____ : | |
| CORNELIUS  HILL : | |
| and : | |
| TRUDIE HASTINGS HILL H/W : | |
| Plaintiffs : | |
| SCHIFFAHRTSGESELLSCHAFT MS : | NO. 02-CV-2713 |
| PRIWALL mbH & Co. KG : | |
| and : | |
| REEDEREI F. LAEISZ G.m.b.h., ROSTOCK : | |
| Defendants : | JURY TRIAL DEMANDED |
| _____ : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    STATEMENT OF FACTS

Plaintiff Cornelius Hill, a longshoreman, filed this lawsuit against defendants
Priwall and Laeisz to recover damages for personal injuries that he allegedly sustained while
working aboard the M/V SEA PANTHER.  Plaintiff seeks to recover damages under the
Longshore and Harbor Workers' Compensation Act, ("LHWCA"), 33 U.S.C. §905(b).  See
Amended Complaint attached hereto as Exhibit "A."

Defendants are the owner and operator of the merchant vessel M/V SEA
PANTHER.  During the time period relevant to this action, the defendants chartered the M/V
SEA PANTHER to Crowley American Transport ("Crowley").  The M/V SEA PANTHER, a
container vessel, was involved in regular liner service carrying containers between ports
throughout the east coast of South America and the east coast of the United States.  See
Amended Complaint, Exhibit "A," at ¶7; see also Defendants' Answer to the Amended
Complaint, attached hereto as Exhibit "B."

On August 25, 2000, the M/V SEA PANTHER, was docked at a pier and terminal operated by Delaware River Stevedores ("DRS") in the Port of Philadelphia. <u>See</u> Amended Complaint, Exhibit "A."  Containers being carried on the vessel were to be discharged by employees of DRS, an independent stevedoring contractor.  <u>See</u> Amended Complaint, Exhibit "A," at ¶10.

At approximately 10:30 p.m. on August 25, 2000, the vessel was turned over to DRS and its employees (the longshoremen) to commence discharge operations.  <u>See</u> Dep. of Captain Schuessler, attached hereto as Exhibit "D," p. 160.  The unlashing of the containers stowed on the vessel was part of the discharge operation and had to be carried out before the containers could be lifted off of the vessel by a crane.  Under the International Longshoreman's Association's collective bargaining agreement in the Port of Philadelphia, only longshoremen are allowed to unlash and discharge containers at the DRS facility.  <u>See</u> Deposition of Mr. Vagn Ejsing, attached hereto as Exhibit "E," p. 26.

Plaintiff Cornelius Hill and his co-employee, Dwight Jones, were employed by DRS as longshoremen.  <u>See</u> Dep. of C. Hill, attached hereto as Exhibit "C," pp. 31-33.  At the start of the discharge operation, Mr. Hill and Mr. Jones were assigned to unlash containers from the aft part of the vessel.  <u>See</u> Dep. of C. Hill, Exhibit "C," at pp. 46-48.

On the day of the accident, the longshoremen's supervisor was given an opportunity to board the vessel and make an inspection.  After that inspection took place, Hill and Jones boarded the vessel and unlashed one "bay" or section of containers without any problems.  <u>See</u> Dep. of C. Hill, Exhibit "C," at pp. 46-48; <u>see also</u> Deposition transcript of co-worker D. Jones, attached hereto as Exhibit "F," at p. 20.

The accident in question occurred while Hill and Jones were unlashing containers at a second bay.  <u>See</u> Dep. of D. Jones, Exhibit "F," at pp. 21 and 22.  Before they started work

near the second bay, Hill and Jones inspected the area and they did not see any defects or problems.  Id. at p. 25; see also Dep. of C. Hill, Exhibit "C," at pp. 59-66.

Plaintiff Cornelius Hill was allegedly injured when he was struck by a falling lashing bar, which was part of the lashing gear used to lash or secure the containers to the deck of the vessel so they did not shift or move during the voyage.  The lashing gear at issue consisted of rods and turnbuckles.

A lashing rod is a galvanized metal pole that has a fitting at the top, which hooks on to a corner of the container.  See photographs attached hereto as Exhibit "G."  The lower part of the lashing pole is then moved into place and secured with a turnbuckle.  Id.  A diagram that demonstrates the attachment of a turnbuckle is attached hereto as Exhibit "H."  Furthermore, during his deposition, Mr. Jones described the procedure for attaching and securing a lashing bar and turnbuckle.  See Dep. of D. Jones, Exhibit "F", at p. 17.

To unlash a container for discharge, the longshoremen would turn or loosen the turnbuckle, loosen the connection, disengage the top of the bar from the fitting at the top corner of the container and lower the bar to the vessel's deck.  See Dep. of C. Hill, Exhibit "C", at pp. 53-57.  However, according to plaintiff Cornelius Hill and his co-worker, Dwight Jones, if the turnbuckle is difficult to turn (i.e. "frozen"), they would hit the turnbuckle with a wrench to "loosen it."  Id. at pp. 58-59; see also Dep. of D. Jones, Exhibit "F", at pp. 22.

Shortly before the accident, Dwight Jones was unlashing a container and he tried to loosen one of the turnbuckles.  When he looked at the turnbuckle and lashing rod, he did not see any defects or problems.  However, the turnbuckle was tight and he had trouble moving it with a wrench.  Therefore, Jones proceeded to strike the turnbuckle with a wrench to "loosen" it. When Jones struck the turnbuckle with the wrench, the top of the lashing rod came out of the

fitting at the top corner of the container and the rod fell and struck Cornelius Hill.  See Dep. of

D. Jones, Exhibit "F," at p. 22.

Prior to the accident, Mr. Jones did not report any problems with the turnbuckle to

his supervisor and he did not tell the crew that there were any problems with the turnbuckle.  In

addition, Jones did not ask Hill for assistance and he did not warn Hill that he was going to strike

the turnbuckle with the wrench.  Id. at pp. 22-32.

Plaintiff Cornelius Hill does not know how or why the accident occurred.  He

does not know of any problems involving the vessel's equipment that contributed to the accident

in any way.  All he knows is that he was hit by a lashing rod and Dwight Jones was the only

person in the area. See Dep. of C. Hill, Exhibit "C," at pp. 64-66.

According to Mr. Jones, he did not see any problems with the equipment before or

after the accident.  He looked at the lashing gear right before he hit it with the wrench and he

could not tell that the lashing pole was going to fall.  Also, after the accident, he did not see any

problems with the lashing gear and he advised that nothing broke when he hit the turnbuckle

with the wrench.  When he hit the turnbuckle, the lashing rod "flew" out and it hit Mr. Hill.  See

Dep. of D. Jones, Exhibit "F," at pp. 27-32 and 35-38.

After the accident, both the Captain and the stevedore supervisor inspected the

area and neither one of them found any defective or broken equipment. See Dep. of V. Ejsing,

Exhibit "E" at pp. 26, 27 and 28,  See also Dep. of Captain Schuessler, Exhibit "D" at pp. 158

and 159.  Therefore, there is no evidence that any defect in the lashing bar, turnbuckle or any

piece of ship's equipment caused the accident.  Plaintiff's co-worker hit the lashing bar with a

wrench and knocked it loose, causing the accident.  See Dep. of D. Jones, Exhibit "F," at pp. 27-

31.

## II.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(c).  Applying this rule, the Supreme Court delineated the standard applicable to motions for summary judgment in what has been termed "its summary judgment trilogy."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Co., 106 S. Ct. 1348, 475 U.S. 574 (1986).  In Celotex, the Court said:

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon
> motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case,
> and on which that party will bear the burden of proof at trial.  In
> such a situation, there can be no genuine issue as to any material
> fact, since a complete failure of proof concerning an essential
> element of the nonmoving party's case necessarily renders all other
> facts immaterial.

106 S. Ct. at 2553, 477 U.S. at 322-23  (emphasis added).  This language was rephrased in Liberty Lobby when the Court stated "[the summary judgment] standard mirrors the standard for a directed verdict . . . which is that the trial judge must direct a verdict if under the governing law, there can be but one reasonable conclusion as to the verdict."  106 S. Ct. at 2511, 477 U.S. at 243.

The mandatory language of these decisions expresses the Supreme Court's viewpoint that summary judgment is not a harsh sanction to be avoided.  In fact, the Supreme Court stated the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 106 S. Ct. at 2555, 477 U.S. at 325 quoting Fed. R. Civ. P. 11. "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way to accomplish this purpose." Id. at 2553, 477 U.S. at 323. Consequently, "a party resisting a motion for summary judgment must come forward with more than speculation in order to raise a material issue of fact." Keystone Data Systems, Inc. v. James F. Wild, Inc., 549 F. Supp. 790, 792 (E.D. Pa. 1982); see also Gans v. Mundy, 762 F.2d 338, 343 (3d Cir. 1985), cert. denied 106 S. Ct. 537, 474 U.S. 1010 (1985); Zimmer Paper Products, Inc. v. Berger & Montague, P.C., 758 F.2d 86, 94 (3d Cir. 1985), cert. denied, 106 S. Ct. 228, 474 U.S. 902 (1985). "Therefore, while the moving party bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Davis v. Kambara Kisen Co. Ltd., 1990 A.M.C. 2825, 2826 (E.D. Pa. 1990), quoting Celotex, 106 S.Ct. at 2553, 477 U.S. 317.

In this case, plaintiff bears the burden of establishing that the defendant vessel owner breached a duty of care under §905(b) of the LHWCA, 33 U.S.C. §905(b). However, as discussed below, plaintiffs cannot carry this burden.[1]

---

[1]In numerous other cases involving claims under §905(b) of the LHWCA, 33 U.S.C. § 905(b), judges in this Circuit have recognized the desirability to both the court and the parties involved to review a plaintiff-longshoreman's evidence prior to trial and grant summary judgment where the evidence does not support a valid cause of action against a shipowner. See e.g., Davis v. Pan Ocean Shipping Co., Ltd., 1999 U.S. Dist. LEXIS 2915 (E.D. Pa. 1999)(Giles, C.J.); Anderson v. Far Eastern Shipping Co., C.A. 99-391 (E.D. Pa. 1999)(Bartle, J.); Glasco v. Amer Yhtyma OY, C.A. 96-04092 (E.D. Pa. 1997)(Rendell, J.); Mullen v. Hoyu Kauin Kaisha, et al., C.A. No. 88-8311 (E.D. Pa. 1990) (Hutton, J.); Irby v. Tokai Lines, C.A. No. 88-6890 (E.D. Pa. 1990) (Hannum, S.J.); Brown v. Baltic Shipping Company, C.A. No. 87-1929 (E.D. Pa. 1989) (Pollak, J.); Gigante v. Runship, Ltd., et al., C.A. No. 88-689 (D.N.J. 1989) (Rodriguez, J.); Brown v. Philippine President Lines, Inc., et al., 704 F.Supp. 606 (E.D. Pa. 1989) (Shapiro, J.).

**B.**       **THE DUTIES OF A VESSEL OWNER/DUTY AT ISSUE**

  **1.**       **The Longshore and Harbor Worker's Compensation Act**

   Plaintiffs' action against the defendants is governed by the standard of negligence that has evolved pursuant to judicial interpretation of §5(b) of the 1972 Amendments to the LHWCA, 33 U.S.C. §905(b).  The history and purpose of the 1972 Amendments has been detailed by the United States Supreme Court in <u>Scindia Steam Navigation, Ltd. v. De Los Santos,</u> 101 S. Ct. 1614, 451 U.S. 156 (1981) and more recently in <u>Howlett v. Birkdale Shipping Co., S.A.,</u> 114 S.Ct. 2057, 512 U.S. 92 (1994).  Briefly summarized, Congress enacted the 1972 Amendments to eliminate the shipowner's previous faultless liability to longshoremen based upon theories of unseaworthiness or a non-delegable duty to provide a safe place to work. "Congress believed that it was fairer, and fully consistent with the goal of promoting safety, for the vessel's liability 'to be predicated on negligence, rather than the no-fault concept of seaworthiness.'" <u>Derr v. Kawasaki Kisen K.K.,</u> 835 F.2d 490, 492 (3d Cir. 1987), <u>cert</u>. <u>denied,</u> 108 S. Ct. 1733, 486 U.S. 1007 (1988), <u>quoting</u> H.R. Rep. No. 1441, 2d Cong. 2d Sass. (1972), reprinted in 1972 U.S. Code Cong. & Admin. News 4698, 4703.  "The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries:  the stevedore-employer.  Subjecting vessels to suit for injuries that could be anticipated and prevented by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 Amendments." <u>Howlett</u>, 512 U.S. at 97 (citations omitted).

   Although Congress made it clear that shipowners shall only be held liable for their "own negligence," it did not specify the acts or omissions that would constitute negligence. Instead, Congress left that issue to "be resolved through the application of accepted principles of

tort law and the ordinary process of litigation -  just as they are in cases involving alleged negligence by land based third parties."  Id.

After the 1972 Amendments became law, the lower federal courts reached varying conclusions regarding the construction and application of § 905(b).  In Scindia, therefore, the United States Supreme Court defined the duties that a vessel owner owes to longshoremen who board a vessel to perform cargo operations.  Scindia Steam Navigation Co. v. De Loss Santos, 451 U.S.156, 175-76 (1981).  In doing so, the Supreme Court drew a distinction between the duties owed before the vessel is turned over to the stevedore for cargo operations and the vessel owner's obligations after cargo operations have begun.  In addition, the Supreme Court drew a clear distinction between hazards related to cargo work and hazards arising from defects in the ship or its equipment.

The Supreme Court held that, before cargo operations begin, a vessel owner owes to the stevedore and its longshoremen-employees a duty of "due care" to have the "ship and its equipment" in a reasonably safe condition and a corollary "duty to warn" about hidden hazards that would not be obvious to or anticipated by a reasonably competent stevedore:

> This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.  The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

Id. at 166-67 (citations omitted).  The duties established in this passage have been termed the "turnover duty" and the "duty to warn."  As noted, they define the shipowner's conduct before cargo operations have begun.

In Scindia, the Supreme Court also defined a vessel owner's duty of care after the vessel has been turned over to the stevedore for cargo operations:

> We are of the view that absent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.  The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.  This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty.  The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations.

> . . . .

> Yet it is quite possible, it seems to us, that Seattle's judgment in this respect was so obviously improvident that Scindia, if it knew of the defect and that Seattle was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch.  The same would be true if the defect existed from the outset and Scindia must be deemed to have been aware of is condition.

Id. at 168-69, 172, 175-76.  In Scindia, therefore, the Supreme Court held that a vessel owner does not have a duty to supervise or inspect the cargo operations of an independent stevedore and, generally, a vessel owner cannot be held liable for hazards that arise during the course of the cargo operations, although the Court did leave open the possibility that a vessel owner may have a "duty to intervene" under very limited circumstances.  See Carpenter v. Universal Star Shipping S.A., 924 F.2d 1539 (9th Cir. 1991), cert. denied, 506 U.S. 955 (1992) (no duty to intervene unless the hazard involves the ship's gear).  Finally, the Supreme Court stated that  a "vessel may be liable if it actively involves itself in the cargo operations and negligently injures a

longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in <u>areas</u>, or from <u>equipment</u>, under the active control of the vessel <u>during</u> the stevedoring operation."  <u>Id.</u> at 167 (emphasis added).

Overall, four duties were recognized by the Supreme Court in the <u>Scindia</u> decision: (1) the "turnover duty" which includes a corollary "duty to warn," (2) the "duty to intervene" and (3) the "active participation duty."  These duties were crafted based on an analysis of the roles played by the stevedore and the vessel owner, the expertise of each and the goal of promoting safety.  In doing so, the Supreme Court drew a sharp distinction between hazards that fall within the scope of the stevedore's work and other types of hazards.

### 2.      Duty At Issue In This Case / Nature of Alleged Hazard

The "active operations duty" established in <u>Scindia</u> is only applicable if the vessel retains active control over the instrumentality or area in question or the activities of the stevedore.  In this case, the evidence clearly shows that the vessel was turned over the stevedore for discharge operations and the vessel did not maintain control over the instrumentality or the area in question.  Therefore, the "active operations duty" is not applicable to this case.  <u>See Davis v. Portline Transportes Maritime Interacional</u>, 16 F. 3d 532 (3d Cir. 1994); <u>see also Mankus v. Swan Reefer</u>, Civil Action No. 02-3425 (E.D.Pa. May 20, 2003) (Yohn, J.)  ("[T]here is no indication that the crew retained the requisite control once the unloading of the cargo began to trigger the active operations duty.")  (attached hereto as Exhibit "I").

Also, a vessel owner only has a "duty to intervene" in the cargo operation of an independent stevedore if it has actual knowledge of a dangerous condition and it has actual knowledge that it cannot rely on the stevedore to avoid or eliminate the alleged hazard.  <u>Scindia</u>, 451 U.S. at 172; <u>Derr</u>, 835 F.2d at 496; <u>Helaire v. Mobil Oil Co.</u>, 709 F.2d 1031 (5th Cir. 1981).

In this case, there is no evidence that the vessel had actual knowledge of the alleged hazard or actual knowledge that it could not rely on the stevedore to remedy, avoid or report any perceived hazards. Therefore, the duty to intervene is not applicable to this case.

The duty at issue in this case is the "turnover duty," which includes a corollary "duty to warn." These duties define a shipowner's standard of care before cargo operations have begun.

In addition to defining the duty at issue, it is important in these cases to identify the hazard that allegedly caused the accident. As noted above, when the Supreme Court defined the duties of a vessel owner, it drew a sharp distinction between hazards that fall within the scope of the stevedore's areas of expertise and hazards involving other areas of the vessel, since the goal of the 1972 Amendment was to avoid holding vessel owners responsible "for injuries that could be anticipated and prevented by a competent stevedore . . . ." Howlett, 512 U.S. at 97. Therefore, it is important to identify those cases where the alleged hazard involves the condition of the cargo stow or the discharge operation – the stevedore's areas of expertise.

In this case, there is no evidence of a defect in the ship or its equipment. The lashing gear was inspected by the plaintiff, Mr. Jones, the Captain and the stevedore supervisor, Mr. Ejsing, and no one saw any defects or mechanical problems. In fact, the facts unequivocally show that the accident occurred because Mr. Jones struck the turnbuckle with a wrench and knocked it loose.

Based on established law, the vessel cannot be held liable for an accident caused by the stevedore-employer's methods of discharge. Scindia, 451 U.S. at 170. However, if plaintiff contends that there was some defect or problem involving the attachment of the lashing gear to the containers, then the alleged hazard involves the condition of the cargo stow, which falls within the stevedore's areas of expertise. Therefore, the scope of the "turnover duty"

applicable to this case is quite limited, as it is in any case where the condition of the cargo stow allegedly causes an accident.  See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92 (1994).

Furthermore, whether or not this case is analyzed as one involving an alleged defect in the cargo stow, the defendants are entitled to summary judgment in their favor because, if the alleged hazard "should have" been known to the vessel owner (as the plaintiffs contend), then the condition likewise should have been apparent to a reasonably competent stevedore. Therefore, the plaintiffs cannot establish a breach of duty by the vessel owner.  See e.g. Morris v. Compagnie Maritime Des Cargeurs, 832 F.2d 67, 69-70 (5th Cir. 1987), cert. denied, 485 U.S. 1022 (1988) ("If obvious, it should have been as apparent to the stevedore as to the shipowner.  It is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity.")


C.    **THE TURNOVER DUTY**

1.    **The Ship And Its Equipment**

The "turnover duty" imposes upon the vessel owner a duty to exercise "ordinary care under the circumstances to have the **ship and its equipment** in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety."  Scindia, 451 U.S. at 167 (emphasis added).  The turnover duty also encompasses a "duty to warn" of latent hazards.  Therefore, the vessel owner's duty to warn is limited to warning the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care."  Gravatt v. City of New York, 226 F.3d 108, 121 (2d Cir. 2000).

"There is no duty to turn over an absolutely safe vessel."  Sinagra v. Atl. Ocean Shipping, 182 F.Supp. 2d 294, 300 (E.D.N.Y. 2001).  Moreover, "certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore

could safely work around them." Kirsch v. Plovidba, 971 F.2d 1026, 1029-30 (3d Cir. 1992). Therefore, to establish a cause of action under the turnover duty for an alleged hazard involving the condition of the ship or its equipment, plaintiff has the burden of establishing that: (1) the accident was caused by a defect in the vessel or its equipment; (2) the defendant vessel owner knew about the hazard or should have discovered it before the vessel was turned over to the stevedore; (3) the hazard was one likely to be encountered by the stevedore in the course of its operations; **and** (4) the hazard was one which plaintiff's employer did not know about and which would not be obvious to or anticipated by a reasonably competent stevedore. Id. (As discussed below, when a condition of the cargo stow is involved, the vessel's "turnover duty" is limited to warning of hidden hazards about which the vessel has **actual knowledge**.)

In this case, there is no evidence to support a conclusion that the accident was caused by a defect in the ship or its equipment. None of the witnesses identified any problems with the ship's equipment. Therefore, any argument that there "must have been" a problem with the lashing gear is based on sheer speculation. Furthermore, if plaintiff argues that the hazard arose from the manner in which the lashing gear was secured, then the alleged hazard involves the condition of the cargo stow, not a defect in the ship's equipment. The application of the turnover duty to hazards involving the  cargo stow case is discussed in the next section of this Memorandum.

Even if the absence of a defect in the vessel's equipment is overlooked, the plaintiffs cannot establish a breach of the "turnover duty" in this case because there is no evidence that the vessel had notice of any alleged hazard. There is certainly no evidence that the vessel had actual knowledge of any hazard involving the lashing gear. Also, plaintiff cannot establish that the vessel had constructive knowledge of a hazard. Prior to the accident, neither the plaintiff nor Mr. Jones observed any problems with the lashing gear even though they

inspected it.  Therefore, there is no evidence to support a conclusion that the vessel could have or

should have discovered the alleged hazard.  Furthermore, as discussed in section (c)(3), if the

alleged hazard was observable or discoverable by a member of the vessel's crew, then the

condition was equally observable and discoverable by the stevedore.  Thus, plaintiff cannot

establish a breach of duty by the vessel owner because, under plaintiff's theory of liability, the

alleged hazard would have been open and obvious to a reasonably competent stevedore.

### 2.    The Cargo Stow – The Expertise of the Stevedore

If it is argued that the alleged hazard arose from the manner in which the lashing

gear was secured to the cargo, then the alleged hazard involves the condition of the cargo stow.

In such a case, the scope of the "turnover duty" is very limited because, when analyzing a vessel

owner's duty of care, "the cargo stow is separate and distinct from other aspects of the ship."

Howlett v. Birkdale Shipping Co. S.A., 512 U.S. 92 (1994).  This is so because "shipowners

engage a stevedore for its expertise in cargo operations and are entitled to assume that a

competent stevedore will be able to identity and cope with defects in the stow."  Id. at 104.

Even before the Scindia decision was issued, courts analyzing a vessel owner's

duties of care recognized that stevedores are hired for their expertise dealing with cargo hazards.

As the First Circuit Court of Appeals pointed out:

> A seagoing ship runs the constant risk of encountering
> severe weather.  As a result, it is unlikely that cargo, no
> matter how carefully stowed, will emerge unscathed
> and unblemished from the journey.  These conditions
> are known to exist and inhere in the very nature of
> seaborne commerce.  **The stevedore is hired for its
> expertise in handling cargo, including cargo which
> arrives from its journey in less than optimal
> condition**.  If stowage or the cargo itself represents a
> risk to the longshoremen, the stevedore normally has
> the right to remedy the defect, at the expense of the ship
> (as was done here with the partial remastering
> performed by the stevedore) or to discontinue
> unloading operations.

Anderson v. Iceland S.S. Co., 585 F.2d 1142, 1151 (1st Cir. 1978); see also Hugev v.

Dampskisaktieselskabet International, 170 F. Supp. 601, 609-10 (S.D.Cal. 1959), aff'd, 274 F.2d

875 (9th Cir.), cert. denied, 363 U.S. 803 (1960).  Other courts have also recognized that

discharging stevedores are hired for their ability to identify and cope with cargo hazards; see e.g.

Citizen v. M/V Triton, 384 F. Supp. 198, 201 (E.D. Tex. 1974) ("The duty to discover and

remedy a dangerous condition caused by the space between the bags of flour as stowed was

clearly the responsibility of the stevedore which had control of the work being done in the

hold...."); Hugev, 170 F. Supp. at 610 ("stevedoring contractors hold themselves out as being

trained and equipped to cope with these conditions and these dangers."); Fedison v. Vessel

Wislica, 382 F. Supp. 4, 6 (E.D. La. 1974); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines,

Ltd., 369 U.S. 355, 366 (1962) ("The petitioner [stevedore] is in the business of handling cargo,

and any danger created by the New York bales was at least as apparent to the petitioner as to the

respondents.  Under its warranty the petitioner had a duty to see that the danger was removed

before proceeding to unload the Philadelphia cargo.") (emphasis added).

   When Congress enacted the 1972 Amendments, one of the goals was to increase

safety by providing incentive to the party in the best position to prevent injuries that occur during

cargo operations: the expert stevedore.  This was accomplished by eliminating the vessel's

liability for hazards that fall within the stevedore's area of expertise.

   As a result of the 1972 Amendments, longshoremen received a "vast" increase in

compensation benefits.  See H.R. Rep. No. 92-1441 at 4703.  The benefits available to

longshoremen now greatly exceed the benefits available in other industries.  Prior to the 1972

Amendments, the maximum compensation was $70.00 per week; in 1994, by the time the

Howlett decision was issued, the maximum compensation rate was $738.30 per week.  An

injured longshoreman cannot sue his stevedore-employer to recover any additional sum, but he

can recover from a shipowner that is found to be negligent.  Out of the longshoreman's recovery from the shipowner, however, the stevedore-employer is entitled to recoup its full compensation lien (33 U.S.C. § 933(g)(3)) and the shipowner is statutorily barred from seeking contribution or indemnity from the "stevedore-employer" under any circumstances (33 U.S.C. § 905(a)(b)).  Therefore, if a plaintiff-longshoreman were permitted to recover damages from a vessel owner for an accident arising from a cargo hazard and/or the method of discharge used by the stevedore, the stevedore-employer would recover its full lien even though its negligence in failing to identify and address the cargo hazard was the primary or sole cause of the accident.  See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256 (1979).  Furthermore, there would be no incentive for the discharging stevedore to initiate and enforce safety procedures pertaining to the discharge of cargo (i.e. the purpose for which the expert stevedore is hired) because the vessel would be held liable for hazards related to the cargo.  See Scindia, 451 U.S. at 181 (Powell, concurring) ("This would decrease significantly the incentives toward safety of the party in the best position to prevent injuries, and undercut the primary responsibility of that party for ensuring safety.")

Based on these principles, the Supreme Court and the Third Circuit Court of Appeals have held that the duties owed by a vessel owner pertaining to cargo conditions are very limited.  In Scindia, the Supreme Court held that a vessel owner's "turnover duty" – i.e. the duty to exercise ordinary care to prepare the ship for discharge operations - is limited to the condition of the "ship and its equipment."  In addition, although the Supreme Court concluded that a vessel owner has a duty to warn that may extend to cargo conditions, that duty is limited to warning of hidden dangers that are **known** to the vessel.

As the Third Circuit Court of Appeals pointed out in Derr, when a cargo hazard is open and obvious there is "no warning that the ship [can give that would add] to the knowledge

of a competent stevedore."  <u>Derr</u>, at 835 F.2d 496.  Furthermore, a basic premise underlying the

entire <u>Scindia</u> decision is the principle that stevedores are hired for their expertise in cargo

operations, which includes the stevedore's ability and duty to identify and deal with cargo

hazards.  Therefore, in <u>Derr</u>, the Court of Appeals held that a vessel owner does not have a duty

to warn about open and obvious hazards involving the cargo.

> Furthermore, in the more recent <u>Howlett</u> decision, the Supreme Court reaffirmed

that, "the cargo stow is separate and distinct from other aspects of the ship."  <u>Howlett</u>, 512 U.S.

at 104.  Throughout the <u>Howlett</u> decision, the Supreme Court made it clear that "shipowners

engage a stevedore for its expertise in cargo operations and are entitled to assume that a

competent stevedore will be able to identify and cope with defects in the stow."  <u>Id.</u> at 104.

> These decisions from the Supreme Court and the Court of Appeals, which hold

that "the cargo stow is separate and distinct from other aspects of the ship" when defining a

vessel owner's duty of care, are consistent with other maritime cases that address the role of

independent contractors.  Under established principles of maritime law, an independent

contractor who performs work aboard a shipping vessel may not recover if he is injured by the

condition he was hired to repair.  <u>West v. United States</u>, 361 U.S. 118 (1959) (no duty to protect

plaintiff from risks inherent in carrying out the contract); <u>Hill v. Texaco, Inc.</u>, 674 F.2d 447 (5th

Cir. 1982); <u>Peters v. Titan Nav. Co.</u>, 857 F.2d 1342 (9th Cir. 1988); <u>Alphin v. Marquesa</u>

<u>Maritime, S.A.</u>, 747 F. Supp. 1223 (E.D. Tex. 1990); <u>Peters v. Titan Navigation Co.</u>, 857 F.2d

1342 (9th Cir. 1988) ("[T]here is no negligence liability when a repairman is injured by the very

condition he is hired to repair.")  Therefore, if a vessel owner's liability for longshore accidents is

premised on principles of negligence law as Congress intended, and not a special theory of

liability, a vessel owner should not be held liable when an accident occurs as a result of an open

and obvious cargo hazard – **because the stevedore is hired to identify and remedy those hazards.**

In this case, there is no evidence that the vessel had actual knowledge of any hazard involving the attachment of the lashing gear to the containers.  Therefore, the vessel owner did not have a duty to warn as a matter of law.

### 3.    Open And Obvious Nature Of Hazard

Plaintiffs' cause of action against the vessel owner is premised on the allegation that some unidentified hazard involving the lashing gear "should have" been discovered by members of the vessel's crew.  This argument itself, however, demonstrates that the plaintiffs cannot establish a breach of the "turnover duty."

By making this argument, the plaintiffs are asserting that the alleged hazard was observable and/or discoverable by an individual who inspected the lashing gear.[2]  If this were true, then the condition also would have been, or should have been, apparent to the plaintiff and Mr. Jones when they began the unlashing process.  Thus, under this scenario, the alleged hazard was "open and obvious" and, as a matter of law, a vessel owner does not have a duty to remedy hazards that should have been apparent to a reasonably competent stevedore.  See e.g. Kirsch v. Plovidba, 971 F.2d at 1030 ("A shipowner will not ordinarily be liable to a longshore worker injured by an obvious hazard because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely"); Morris, 832 F.2d at 69-70 ("If obvious, it should have been as apparent to the stevedore as to the shipowner.  It is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it

---

2 However, this suggestion is contradicted by the testimony of longshoreman Jones who testified that he looked at the gear and tried to loosen it right before he struck it with the wrench and he did not see any problems.  Therefore, the uncontradicted evidence demonstrates that the condition would not have been discoverable during an inspection conducted with "ordinary care;" thus, constructive knowledge of the hazard by the vessel owner cannot be established.  Scindia, 451 U.S. at 167.

with impunity."); <u>Pledger v. Phil Guilbeau Offshore, Inc.</u>, 2003 WL 2012382 (E.D.La. May 1,

2003).


**III.    <u>CONCLUSION</u>**

       Based on the foregoing, plaintiffs cannot establish a breach of duty by the vessel

owner.  Therefore, defendants respectfully request that this Court grant their Motion and enter

summary judgment in their favor.

                              Respectfully submitted,

                              RAWLE & HENDERSON LLP


                              By:_____
                                     Carl D. Buchholz, III, Esquire
                                     Michael P. Zipfel, Esquire
                                     Charles W. McCammon, Esquire
                                     Attorneys for Defendants
                                     The Widener Building
                                     One South Penn Square
                                     Philadelphia, PA 19107
                                     215-575-4200

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORNELIUS HILL : | |
| and : | |
| TRUDIE HASTINGS HILL H/W : | |
| Plaintiffs : | |
| SCHIFFAHRTSGESELLSCHAFT MS : | NO. 02-CV-2713 |
| PRIWALL mbH & Co. KG : | |
| and : | |
| REEDEREI F. LAEISZ G.m.b.h., ROSTOCK : | |
| Defendants : | JURY TRIAL DEMANDED |
| : | |

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing Motion for Summary Judgment was served by First Class Mail, postage prepaid, to the following counsel of record:

E. Alfred Smith, Esquire
1333 Race Street, 2nd Floor
Philadelphia, PA 19107
Attorney for Plaintiff

_____

Carl D. Buchholz, III, Esquire
Michael P. Zipfel, Esquire

On this 7th day of July, 2003.

840474 v.1