UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

```
_____
CORNELIUS HILL                      :
        and                         :
TRUDIE HASTINGS HILL H/W            :
        Plaintiffs                  :
     v.                             :
Schiffahrtsgesellschaft MS Priwall  :   No. 02-CV-2713
mbH & Co. KG                        :
        and                         :
Reederei F. Laeisz G.m.b.h.,        :
Rostock                             :
        Defendants                  :
_____
```

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**Counterstatement of the Facts**

   1.   Plaintiff accepts as true Pars. 1-4 of Defendant's Motion.

   2.   Plaintiff began working as a longshoreman in 1974 and has had no other jobs since then. (Hill, 16-19).

   3.   Plaintiff and his breaster, Dwight Jones, boarded the SEA PANTHER at about 11:15 p.m. on August 24, 2000, and their job was to unlash containers which were to be discharged. The containers were stowed on the main deck. (Hill, 28, 37-38, 44-45; Jones, 14, 19).

1

4. After they boarded the vessel, the men obtained wrenches to be used in their work, and these were ship's equipment which was stored in bins on the main deck near the gangway. (Hill, 51-52; Jones, 15, 16).

5. Plaintiff and his breaster went aft and unlashed the containers in one Bay, and these containers were then discharged. (Hill, 46, 47; Jones, 20). Plaintiff and Jones then went to a second Bay.

6. Unlashing the containers was a one-man job. (Hill, 48, 54, 55; Jones 28, 35; see illustration which is Exhibit H to Defendant's Motion and Memorandum).

7. Jones was unlashing a container and plaintiff was about 24-25' away with his back to Jones, and he was also unlashing a container. (Jones Affidavit ¶5).

8. The container which Jones was trying to unlash was on the third tier. Containers are about 9' high, so the container was about 18' above the deck. The lashing rod fit into a fitting at the bottom of the container and then went diagonally across the two containers beneath it to a turnbuckle attached to the deck. The turnbuckle connection was about 4' above the deck, so the rod was about 18' long. (Jones Affidavit ¶3).

9. Jones looked up at the container to check its number and make sure he was unlashing the right container. (Jones, 22, 25). He didn't see any problems (Jones, 25) but from looking at it he couldn't tell that it was going to fall (Jones, 31-32). He was principally concerned with making sure he had the right container to unlash. (Jones, 22, 25-26). If the lashing rod had not been seated properly in the bottom of the container on the third tier, Jones would probably not have been able to see that. (Ejsing, 46-47).

10. Jones tried to loosen the turnbuckle, but it was frozen and wouldn't move. Jones noticed that the turnbuckle was rusty and had not been greased, and he believed this was the reason it wouldn't move. (Jones 22-24, 42). He knew there was no grease on the turnbuckle because there was no grease on his gloves and no grease on his coveralls. (Jones 36-37, 42).

11. Jones then struck the turnbuckle with the wrench, and this was the routine procedure followed by longshoremen when they encountered a frozen turnbuckle which couldn't be loosened by manpower. (Jones 22, 24, 38-39; Jones Affidavit ¶7; Hill, 58, 59; Ejsing, 20, 53). Jones didn't think there was any danger in hitting the turnbuckle with the wrench. (Jones, 38).

12. Encountering a frozen turnbuckle is something longshoremen occasionally encounter but not often, especially if the turnbuckles are greased. (Jones, 37).

13. After Jones struck the turnbuckle, it loosened and the lashing rod which it secured came out and flew through the air and struck plaintiff on the back of the neck and shoulder. (Jones, 22, 27).

14 Plaintiff was wearing his hard hat at the time, but it provided no protection. (Jones, 22-23).

15. Normally when a frozen turnbuckle is loosened, it has to be turned a few times before the lashing rod comes out. (Jones Affidavit, ¶9, Ejsing, 53-54).

16. Jones had never before seen a lashing rod fly out from a turnbuckle immediately after the turnbuckle was loosened nor has he ever heard of anyone else who has. (Jones, 37-38). Having the lashing rod come out immediately was highly unusual and unexpected. (Jones Affidavit ¶9, Ejsing, 31, 32, 46).

17. The turnbuckles and lashing rods were ship's gear. The Charter Party required the ship to furnish them, and the Charterer's designee, David Burke, testified unequivocally that the turnbuckles and lashing rods belonged to the ship. (Exhibit 7-Rider to Time Charter, Clause 82; Burke, 36-37).

18. Attached as Exhibit 12 are copies of relevant portions

of the Shipboard Manual and Directives, all of which was produced by the ship's Captain. These show that the Chief Mate was responsible for the condition, maintenance and use of all lashing materials. (Shipboard Manual ¶8.1.1, 8.1.4; Directive 08/96/04 ¶3.2 and Annex I ¶¶ Loading operations and Maintenance).

19. The turnbuckle and lashing rod being worked on by Jones were put on when the container they were securing was loaded aboard the vessel in Buenos Aires on August 6, 2000. (Schuessler, 146-147; Exhibit 8-Logbook certificate - 8/7/00).

20. The lashing gear was put on by longshoremen in Buenos Aires, after which it was inspected by the Chief Mate, as evidenced by the certificate entered in the deck log. When the Chief Mate signs the certificate, it means he has inspected the lashings and found them to be in order. (Schuessler, 54-56, 137-139, 146-147; Exhibit 8-Logbook certificate - 8/7/00).

21. The inspection of this gear was necessary to ensure the cargo's seaworthiness before the vessel put to sea. No ship's officer wants 20' or 40' containers to shift at sea, especially during a storm. (Burke, 43-44; Schuessler, 147-148; Ejsing, 55-56).

22. After the vessel departed Buenos Aires, it went to Rio Grande and Santos and Rio De Janeiro and Puerto Cabello before coming to Philadelphia. At each of these ports containers were discharged and loaded, and all of the lashings were inspected by the ship's officers, as evidenced by the certificates completed by the Chief Mate and inserted in the deck log. (Exhibit 8-Deck Log Certificates; Schuessler, 137-148).

23. Each day while the vessel was at sea en route to Philadelphia the lashings were supposed to be inspected by the Chief Mate, and the Captain estimated that the lashings in issue were inspected by ship's officers as many as 30 times before the accident date. The inspections made at sea were not noted in the logbook because the inspections were part of the usual duties of the officers. (Schuessler, 138-142, 146).

24. Attached as Exhibit 10 is a copy of one of the stevedoring records produced by the Stevedoring Superintendent. (Ejsing, 33, 34). This Summary of Operations shows that a total of 420 20' and 40' containers were discharged in Philadelphia. With 2 lashings per container, (Jones, 25), this shows that there were at least 840 turnbuckles and lashing rods that had to be inspected after the containers were loaded, daily while the

vessel was at sea and again before discharging began in Philadelphia.

25. Attached as Exhibit 11 are copies of other documents produced by the Stevedoring Superintendent. (Ejsing, 33, 34). These Discharge Schematics show the containers on the vessel destined to be discharged at ports after Philadelphia in the Bays containing containers to be discharged in Philadelphia. These also had 2 lashings per container, so the number of lashings which were supposed to be inspected by the officers was quite considerable.

26. On the day before the accident the Chief Mate reported that he and the Mate on Duty had conducted an inspection of all of the lashings on the containers to be discharged, and this was a routine inspection. (Schuessler, 150-154).

27. The Chief Mate reported to the Captain that the vessel was ready for discharge. (Schuessler, 154).

28. No entry pertaining to plaintiff's accident was made in the deck log. (Schuessler, 148-149).

29. The officers on duty sometimes failed to make proper entries, and the Captain sometimes missed this when he reviewed

the log for accuracy.  His explanation for missing these lapses by his subordinate officers was that he was "human." (Schuessler, 142-144).

    30.  With respect to the inspections of the lashings by his officers, the Captain was asked if they could have missed something, and he acknowledged they could have.

    31.  The exchange with the Captain was as follows:

> "Q: Now, you testified to all of these inspections of the turnbuckles and the lashing rods, correct?
>
> A: Yes.
>
> Q: Certainly all of the men who made these inspections were human, were they not?
>
> A: Of course.
>
> Q: And they could just as easily have missed something as they could easily have failed to put entries in your deck log, correct?
>
> A: As long as they are humans, of course."
>
> (Schuessler, 201)