UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

```
_____
CORNELIUS HILL                    :
          and                     :
TRUDIE HASTINGS HILL H/W          :
          Plaintiffs              :
          v.                      :
Schiffahrtsgesellschaft MS Priwall :    No. 02-CV-2713
mbH & Co. KG                      :
          and                     :
Reederei F. Laeisz G.m.b.h.,      :
Rostock                           :
          Defendants              :
_____
```

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant's Motion and Memorandum contain one vital omission and one critical misstatement.

The omission is that defendant does not acknowledge that the turnbuckles and lashing rods were ship's gear.  Accordingly, the turnover duty, and the corollary duty to warn, applied to this equipment, especially in light of the fact that the ship's officers inspected it after (1) it was put in place; (2) daily while the vessel was at sea; and (3) again before the longshoremen began work in Philadelphia on the date of the accident.

1

The misstatement is that defendant said that there were no defects in the turnbuckles and lashing rods.  The longshoreman who was attempting to remove the turnbuckle and lashing rod at the time of the accident saw that the turnbuckle was rusty and not greased, and this is apparently what caused the turnbuckle to be frozen.  Furthermore, the lashing rod was apparently not seated properly in the container above and in the turnbuckle below, and this condition enabled the rod to fly out when the turnbuckle was unfrozen.  A lack of proper maintenance is clearly a "defect", as is the improper seating, so defendant's statements that the gear was not defective are untrue.

Defendant's statements about the purpose of the 1972 amendments are only partially accurate but incomplete.  It is true that the compensation rates are very high and that the stevedoring company in most instances has the primary duty to provide a reasonably safe place to work.  Defendant does not acknowledge that most accidents result in compensation claims only.

Although there are probably hundreds of accidents during each year, only a very small percentage of them result in lawsuits.  The rest are compensation claims, with the stevedoring company bearing the cost, which is enormous.

2

At any one time there are probably no more than 10-20 lawsuits pending in this Court which are longshoremen's injury cases.  In this very small number of cases, as in this one, fault on the part of the vessel owner can be demonstrated.  These are the cases in which Congress reserved to the longshoremen a right to recover for the negligence of the vessel owner.  In these cases Judge Becker's opinions in _Kirsch_*, _Davis_** and _Serbin_*** say that Summary Judgment is not appropriate for many reasons, even if some fault can be attributed to the stevedore, because there can be more than one proximate cause for an injury.

Just as the stevedoring company bears the enormous cost of compensation in the overwhelming majority of cases, so too should the vessel owner bear the cost when its fault, as in this case, failed to provide the skilled longshoremen with a reasonably safe place to work.  Holding the vessel owner to account for its fault in these cases, which are very small in number, is perfectly consistent with Congressional intent and with the overall scheme envisioned by the Supreme Court when allocating the costs of these accidents to the party in the better position to take remedial steps.  In this case that is undeniably the shipowner.

*971 F.2d 1026 (3d Cir. 1992)
**16 F.3d 532 (3d Cir. 1994)
***96 F.3d 66 (3d Cir. 1996)

II.  **The Summary Judgment Standard**

The standard for considering a Summary Judgment Motion was set forth succinctly by the Third Circuit in *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66 (3d Cir. 1996) as follows:

> Summary Judgment is proper "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there in no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Upon a motion for summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  In evaluating whether the non-moving party has established each necessary element, we must grant all reasonable inferences from the evidence to the non-moving party.  See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
>
> 96 F.3d at 69, 70

III. **The Defendant's Duties Under the Longshore Act**

Suit in this case was started pursuant to Sec. 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §905(b).  This statute, *inter alia*, enables longshoremen to sue vessel owners for damages for injuries caused by a shipowner's

4

"negligence".  However, that term is not defined in the Act, and Congress left its interpretation to the Courts.

The lodestone case setting forth the basic framework for the Act's operation is *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981).  There the Court said that a shipowner's "duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property..." 451 U.S. at 166-67.

As explained in *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66 (3rd Cir. 1996), *Scindia* and subsequent cases have shown that the Longshore Act imposes three duties on shipowners: (1) the "turnover" duty, with a corollary duty to warn; (2) the "active operations" duty; and (3) the "intervention" duty.  As the *Serbin* court noted, "The primary differences between these duties turn on scope of conditions or events for which the ship is responsible."  96 F.3d at 70.

1.    **The "turnover duty" and the corollary duty to warn**

   A.   **The ship and its equipment and appliances**.

   As set forth in *Jackson v. Egyptian Nav. Co.*, 222

F.Supp. 2d 700 (E.D.Pa. 2002), the turnover duty and its

corollary may be summarized as follows:

> "A vessel must exercise ordinary care under
> the circumstances to turn over the ship and
> its equipment and appliances in such condition
> that an expert and experienced stevedoring
> contractor, mindful of the dangers he should
> reasonably expect to encounter, arising from
> the hazards of the ship's service or other-
> wise, will be able by the exercise of
> ordinary care to carry on cargo operations
> with reasonable safety to persons and
> property.
>
> A corollary to the turnover duty requires the
> vessel to warn the stevedore of any hazards
> on the ship or with respect to its equipment,
> so long as the hazards are known to the vessel
> or should be known to it in the exercise of
> reasonable care, and would likely be en-
> countered by the stevedore[,] and would not
> be obvious to or anticipated by him if
> reasonably competent in the performance of
> his work.  Id. at 98-99, 114 S.Ct. 2057
> (quoting Marine Terminals, 394 U.S. at
> 416 n. 18, 89 S.Ct. 1144).

                             222 F.Supp. 2d at 704, 705

   In this case a reasonable jury could find that the shipowner

breached both prongs of the turnover duty applicable to the ship

and its equipment.  The lashing gear, including the turnbuckles

and lashing rods, belonged to the ship.  The improper seating or

affixing of the rod to the container and the turnbuckle was an

unsafe condition because the turnbuckle was rusty and frozen and

the lashing rod popped free as soon as the turnbuckle came loose. A properly greased turnbuckle would not have been frozen, and if it had become frozen for some reason, the rod should have remained connected to the turnbuckle until a few turns had been taken on the turnbuckle after it had become unfrozen.  The rod should never have popped out.  Likewise, the rod apparently was not seated properly in the fitting at the bottom of the container, and this could not have been seen by Jones.  This was the testimony of Vagn Ejsing, the stevedoring superintendent, and the unsafe aspect was supported by the opinion of plaintiff's maritime expert, Captain Joseph Ahlstrom.  Ejsing said he had never known of this happening before, and Jones also so testified.

The shipowner breached the corollary to the turnover duty because it failed to warn the stevedore of the rusty turnbuckle and the improperly affixed lashing rod.  This gear was the subject of approximately 30 inspections by the ship's officers before the discharging operation began in Philadelphia.  Although the gear was put on by longshoremen in Buenos Aires, it was inspected immediately afterward by the ship's officers to ensure the seaworthiness of the stow before the ship put to sea.  No officer wants containers to come free during a storm at sea, so it is incumbent upon the officers, for their own safety, to inspect the lashings to make certain they are properly in place

before the vessel sails.  As Captain Schuessler testified, this means examining each one closely and touching or handling them as necessary.

Inspections were also made at the subsequent loading ports in Santos and Rio de Janiero and Puerto Cabello, and inspections were made daily while the vessel was underway proceeding to Philadelphia.  Finally, an inspection was made before stevedoring operations began in Philadelphia.

The improperly affixed lashing rod was something an experienced, careful ship's officer should have seen and corrected, and this is the opinion of Captain Ahlstrom.  It is also a very reasonable inference to be drawn from the circumstances.  The number of turnbuckles and lashing rods that were to be inspected each time was close to 1000, so missing one would not be surprising.  The vessel's Master admitted that his officers could have missed the frozen turnbuckle and improperly

seated lashing rod because the officers are human, and this falls within the classic definition of negligence.

**B.   Cargo**

The ship and its cargo are generally viewed differently by the courts, and this is because access to and control of each vary.  The stevedoring company is admittedly an expert in handling cargo, and it operations, including cargo handling, are its responsibility in most instances.

In *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490 (3d Cir. 1987) two longshoremen were injured by cargo which fell upon them during the discharge of the vessel.  A directed verdict for the vessel owner was affirmed on appeal.  The longshoremen contended that the vessel owner was negligent because it was obvious that the cargo was improperly stowed by the foreign stevedore.  The Third Circuit said that the shipowner has no duty to supervise or inspect cargo loaded by a foreign stevedore and no duty to inspect the stow before turning the vessel over to the stevedore.  Although it did not discuss the "turnover" duty as such, it is clear that it applied that test.  It affirmed the grant of the directed verdicts because the alleged dangerous conditions in the stow were easily observable upon a reasonable inspection, so the

9

expert stevedore should have taken precautions to eliminate the danger.

The reasoning of _Derr_ was essentially upheld by the U.S. Supreme Court in _Howlett v. Birkdale Shipping Co., S.A._, 512 U.S. 92 (1994), which dealt with the vessel owner's duties with respect to a stow admittedly created by a foreign stevedore.

_Howlett_ explained the vessel owner's duties with respect to cargo as follow:

> "For purposes of delineating the scope of a shipowner's turnover duty, then, the cargo stow is separate and distinct from other aspects of the ship. When between ports, the vessel and its crew have direct access to (and control over) the ship itself and its gear, equipment and tools. The vessel's responsibilities to inspect these areas of the ship are commensurate with its access and control, bearing in mind, of course, that negligence, rather than unseaworthiness, is the controlling standard where longshoremen are concerned. Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison. See _Robertson v. Tokai Shosen K. K._, 655 F.Supp. 152, 154 (ED Pa.), aff'd 835 F.2d 490 (CA3 1987), cert. denied, 486 U.S. 1007 (1988).
>
> In sum, the vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work. _Scindia Steam_, 451 U.S., at 167. Furthermore, the duty encompasses only those hazards that "are known to the vessel or should be known to it in the exercise of reasonable

10

care." Ibid. Contrary to Howlett's submission,
however, the exercise of reasonable care
does not require the shipowner to supervise
the ongoing operations of the loading stevedore
(or other stevedores who handle the cargo before
its arrival in port) or to inspect the completed
stow.

                    512 U.S. at 98

Although the turnbuckles and lashing rods were ship's
equipment, they were attached to containers which made up the
ship's stow of cargo.  The containers in issue were on the main
deck of the vessel.  The lashing gear was inspected by the ship's
officers immediately after it was installed and repeatedly
thereafter at other loading ports and each day the vessel was at
sea proceeding toward Philadelphia and again before discharging
began in Philadelphia.

This direct access to and control over the lashing gear is
directly counter to the Supreme Court's reasoning for stating
that the vessel owner's duties regarding cargo are "limited" by
comparison to its duties regarding the ship and its equipment.

Nevertheless, the duty to warn attaches to latent conditions
in the cargo not known to the stevedore and not obvious to or
anticipated by a skilled stevedore.  A reasonable jury could find
that the shipowner breached this duty because although the rusty
condition of the turnbuckle was obvious, the improper attachment
of the lashing rod to the container and the turnbuckle was not.
This condition should have been observed by a competent, careful

                         11

ship's officer but not by a longshoreman, as the opinion of Captain Ahlstrom points out.  Stevedoring Superintendent Ejsing also acknowledged that Jones could probably not see the improper seating in the fitting in the container.  Furthermore, the longshoreman, Jones, was more concerned that he had the right container, so he was more interested in checking the numbers on the container than looking to see if the rod was under tension and likely to pop out.  He had never seen this happen before, and neither had the Superintendent, Ejsing.

On the other hand, the officers inspected the lashings some 30 times, and the purpose of their inspections was to make certain that the lashings were proper and the stow was tight and therefore seaworthy.  Improper seating and undue tension on the lashing rods are the very things their inspections were intended to uncover.  This is the essence of the Master's testimony and supported by the opinion of plaintiffs' expert, Captain Ahlstrom.  Yet, as Captain Schuessler pointed out, the officers could have missed this simply because they are human.  This is within the classic definition of negligence, so a reasonable jury could easily find that this was something the vessel owner should have known and should have corrected or at least warned the stevedore about.  Its failure to do either could therefore be found by a reasonable jury to be negligence.

**C.    Obviousness**

12

_Kirsch v. Plovidba_, 971 F.2d 1026 (3d Cir. 1992) dealt with an empty cargo hold with a large oil slick on the deck. The Third Circuit affirmed the District Court's grant of Summary Judgment. It considered whether there were alternative measures which the longshoremen could have used to avoid the obvious oil slick or whether they could have cleaned it up themselves.

The Third Circuit held that "a shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." 971 F.2d at 1031.

It said that although "obviousness" is normally a jury question, it was not in that case because among the alternatives was the option that the longshoremen, rather than walking through the oil, could have cleaned it up themselves or had the crew do it, and there was no evidence that the shipowner should have realized that the longshoremen would not clean it up themselves or otherwise avoid it.

The Court's discussion of the significance of an "obvious" hazard is essentially as follows:

The Turnover Duty and Obvious Hazards

> A shipowner will not ordinarily be liable to a longshore worker injured by an obvious hazard because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely. The basic theme of the Supreme Court's decision in _Scindia_ is that "[a]s a

general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." 451 U.S. at 170, 101 S.Ct. at 1623. _Scindia_ "plac[es] the primary burden on the stevedore for avoiding injuries caused by obvious hazards." Id. at 180, 101 S.Ct. at 1628 (Powell concurring). The Ninth Circuit has observed that the fact that cargo operations will be conducted by an "expert and experienced" stevedore "implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." _Bjaranson v. Botelho Shipping Corp., Manila_, 873 F.2d 1204, 1208 (9th Cir. 1989). We agree. Accordingly, a ship-owner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so.

\*   \*   \*

But in some cases, a shipowner cannot reasonably
rely on longshore workers to avoid obvious hazards,
and therefore the courts have rejected a bright-line
rule that a shipowner can never be liable for in-
juries caused by obvious hazards.  For example,
if a hazard is obvious yet practically unavoidable,
the shipowner can hardly reasonably expect the
stevedore or the longshore worker to avoid the
hazard.  Frequently, this question is one of degree,
for the standard is not whether it was absolutely
impossible to avoid the hazard, but whether, under
all the circumstances, safer alternatives were im-
practical.  See, for example, *Morris*, 832 F.2d at 71
("longshoreman need not show that he had no possible
alternative but ... only that the circumstances
made safer alternatives unduly impractical or
time-consuming).  In many cases, this fact-
intensive question will be inappropriate to decide
on summary judgment and must be left for the jury.

971 F.3d at 1029, 1030

*Serbin v. Bora Corp. Ltd.*, 96 F.3d 66 (3d Cir. 1996)
dealt with the active operations duty, but the court did make
some observations pertinent to the turnover duty.

In *Serbin*, the accident happened by reason of a stuck block
which was part of the gear used to open and close the ship's
hatches - something only the crew operated.  The plaintiff had
discovered this stuck block, and instead of summoning the crew to
fix it, he first attempted to move it himself and then enlisted
the help of another longshoreman.  While attempting to move it,
the other longshoreman lost control of a block of wood he was
using and the stuck block came free and hurled plaintiff into the
air.  This caused him to fall to the deck below and seriously

15

injure his knee.

With respect to the "obviousness" of the danger as being a defense, the court in _Serbin_ repeatedly said that this is a jury question and not one for resolution by Summary Judgment:

> To begin with, this Court has consistently stated that obviousness is generally a question for the jury, not often appropriate for resolution by the court on summary judgment. See, e.g., id. At 540; _Kirsch_, 971 F.2d at 1030. We think that reasonable minds could differ on whether an "obstructed" block presented an obvious danger under those circumstances, and that it is for the fact-finder, therefore, to decide the obviousness issue in this case.
>
> *   *   *
>
> It is also generally for the fact-finder to determine whether, even if the hazard was obvious, it was also "unavoidable." See _Kirsch_, 971 F.2d at 1030. As we explained in _Kirsch_, if a hazard is obvious yet practically unavoidable, the shipowner can hardly reasonably expect the stevedore or the longshore worker to avoid the hazard. Frequently, this question is one of degree, for the standard is not whether it was absolutely impossible to avoid the hazard, but whether, under all the circumstances, safer alternatives were practical. In many cases, this fact-intensive question will be inappropriate to decide on summary judgment and must be left for the jury. 96 F.3d at 73

The case before the court is not akin to the presence of an oily deck which longshoremen can avoid or clean up (_Kirsch_) or a patently obvious unsafe condition in a stow (_Derr_) or to the use of an obviously defective ladder when a safe alternative was

available.  See *Morris v. Compagnie Maritime des Chargeurs Reunis, S.A.,* 832 F.2d 67 (5th Cir. 1987).

Although the rust on the turnbuckle was obvious because Jones saw it, the improper attachment of the lashing rod was not. If it was, it would have been observed by one or more of the officers when they made their 30 or so inspections where they were looking for conditions like this.

When Jones saw the rust and determined that the turnbuckle was frozen, he was obliged to take practical steps to remedy it because the condition itself was unavoidable since the lashing had to be removed for the container to be discharged.  He did so by hitting the turnbuckle with the wrench, which is what lonshoremen have always done when they encounter a frozen turnbuckle.  This was the testimony of Jones, Hill and Ejsing. After he did so, the turnbuckle freed and the lashing bar immediately popped out and flew, and this was something Jones had never seen before nor had the Superintendent, Ejsing.  Frozen turnbuckles were something that longshoremen encountered occasionally, and they always remedied that by hitting the turnbuckle with a wrench.  Stopping the work and reporting it to a Hatch Foreman or the crew would have been not only time-consuming and silly but contrary to the custom and practice that expert and experienced longshoremen have always followed in the Port of Philadelphia.  The Hatch Foreman in those circumstances,

would have hit the turnbuckle just like Jones did.

A reasonable jury could therefore easily find that the hazard (the improperly affixed lashing rod) was not obvious and that Jones took reasonable, practical steps to remedy the obvious problem of the rusty turnbuckle, so the vessel owner could still be found liable as previously discussed.

Furthermore, _Kirsch_ and _Serbin_, stress that obviousness is in most cases a jury question which should not be resolved by Summary Judgment.

The foregoing analysis is consistent also with the reasoning of Judge Yohn in _Mankus v. Swan Reefer I, A/S_ (copy attached). In _Mankus_ the condition was created by the crew whereas here the gear was repeatedly inspected by the officers, so the so-called absolute bar of an "open and obvious" condition in the stow (with which plaintiff does not agree) was not applied by Judge Yohn and should not be applied here, especially since ship's gear (and not cargo) was involved.

**IV.**   **Breach of ship's duty as defeating Summary Judgment**

In _Serbin_, supra, the Court said that the two "arguably relevant" duties were the turnover and the active operations duties.  It then went on to note that fault on the part of the vessel rendered the inquiry irrelevant:

> With the exception of the "obviousness"
> inquiry, however, discussed _infra_, which
> duty controls is not important here: _if_
> the block presented a hazard--whether

> through the turnover or the active operations
> theory--the ship breached its duty to Serbin.

96. F.3d at 71

The foregoing suggests that evidence of fault on the part of the vessel owner precludes the grant of Summary Judgment.  Even if Jones could be criticized for not having stopped the work and gone running to a crew member, the ship could still be found at fault for having failed to maintain the turnbuckle properly and to discover and correct the improper attachment of the lashing rod to the container and the turnbuckle which enabled the rod to pop loose immediately after the turnbuckle became unfrozen.  As stated in _Serbin_, "[I]t is fundamental that there may be more than one proximate cause of an injury (citation omitted)." 96 F.3d at 75.

Plaintiff earnestly submits that on this record the shipowner cannot be found to be 0% at fault, so Summary Judgment cannot be justified.

V.   **Causation**

The lashing rod flew through the air and struck plaintiff, and this rendered him unconscious.  Accordingly, causation is not an issue.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgement should be denied.

19

Respectfully,


E. ALFRED SMITH & ASSOCIATES


_____
E. Alfred Smith
Christine L. Serbanic
1333 Race Street, 2nd Floor
Philadelphia, PA 19107
(215) 569-8422

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has, on this date, caused a true and correct copy of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment to be served by first class mail, postage prepaid, on the date listed below upon the following party or counsel of record:


    Charles W. McCammon, Esquire
    Rawle & Henderson LLP
    The Widener Building
    One South Penn Street
    Philadelphia, PA 19107
    Counsel for Defendants
    Schiffahrtsgesellschaft MS Priwall mbH & Co. KG
    Reederei F. Laeisz G.m.b.h., Rostock



_____
E. Alfred Smith
Attorney for Plaintiffs
Cornelius Hill and Trudie Hastings
Hill

20

Dated: